**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**SEMAJ LEARY** | Docket No.: 19-CR-10474-DJC |

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**
**AND MEMORANDUM IN SUPPORT**

Defendant, Semaj Leary, respectfully moves this Court to suppress evidence police obtained from his fanny pack after unlawfully stopping him without reasonable suspicion or probable cause. The fanny pack fell on the ground, and Mr. Leary maintained a reasonable expectation of privacy in its contents. The evidence seized by a warrantless search of the bag must be suppressed.

**I.   Statement of Facts**

On August 15, 2019, three Boston Police officers assigned to the Youth Violence Strike Force patrolled the Jamaica Plain neighborhood in an unmarked Boston Police cruiser. Supplement to the Incident Report, Boston Police Department, Submitted by Officer Shawn Butler ("Exhibit A"), at 4. Officers observed Mr. Leary "leaning against the driver side window of a [car] in the rear of 2030 Columbus Avenue." *Id*. One officer "observe[d] Mr. Leary to be wearing a fanny pack around his chest." *Id.* at 5.

Officers were allegedly aware that Mr. Leary was designated an active, verified member of the H-Block gang by the Gang Assessment Database maintained by the Boston Regional Intelligence Center ("BRIC"). *Id*.; Gang Assessment Database Verification of Semaj Leary ("Exhibit B"). According to the officers, they were also aware of a BRIC "Officer Safety and

1

Awareness" Bulletin disseminated via department email on July 31, 2019, which stated the uncorroborated belief that Mr. Leary may be in possession of a firearm. Exhibit A at 5; BRIC Officer Safety and Awareness Bulletin (July 31, 2019) ("Exhibit C"). Officers state that they were familiar with a "trend" of concealing illegal firearms within fanny packs. *Id*.

Officers exited their unmarked cruiser and approached Mr. Leary. *Id*. Mr. Leary turned away from the police and began running. *Id.* One officer reported that Mr. Leary appeared "wide eyed and…extremely concerned with the officer's actions." *Id*.

A chase ensued. *Id*. Mr. Leary ran towards the front of 2030 Columbus Avenue, hurdled a fence, and proceeded down School Street, where he jumped another fence. *Id*. Mr. Leary continued to Glines Avenue, with officers in close pursuit. Mr. Leary then hopped another fence, distancing himself from the officers, and made his way through yards located between Glines Avenue, School Street, and Chilcott Place. *Id*.

Officers radioed Mr. Leary's name, description, and location, and arriving officers set up a perimeter. *Id*. Multiple officers responded to assist. *Id*. An unidentified neighbor outside Sixteen Chilcott Place told officers that an individual jumped into the back of a truck. *Id*. With the vehicle surrounded, officers announced their presence, and approached the truck. *Id*. Officers located Mr. Leary in the back of the truck bed. *Id*. They placed him under arrest. *Id*.

The officers observed that Mr. Leary was not wearing a fanny pack or shoes. *Id*. After searching the area, officers located the fanny pack and sneakers nearby. *Id*. One sneaker was stuck in a fence that had been climbed during flight. *Id.* The fanny pack was approximately five feet away. *Id.*

The officers searched the fanny pack without a warrant, and found a loaded firearm and an additional magazine. *Id*. at 6.

2

**II.     Legal Standards**

The Fourth Amendment protects individuals against "unreasonable searches and seizures" by government actors. U.S. Const. amend. IV. This prohibition is enforced through the exclusionary rule, which aims to safeguard Fourth Amendment rights through its deterrent effect. *Terry v. Ohio*, 392 U.S. 1, 12 (1968).

"The protections of the Fourth Amendment apply not only to traditional arrests, but also to those brief investigatory stops generally known as *Terry* stops." *United States v. Camacho*, 661 F.3d 718, 724 (1st Cir. 2011). In *Terry*, the Supreme Court held:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

392 U.S. at 30-31.

For a *Terry* stop to be reasonable under the Fourth Amendment, the officer's action must be "justified at [its] inception[.]" *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001). To be so justified, the stop must be based on "a reasonable, articulable suspicion of an individual's involvement in some criminal activity." *United States v. Ruidíaz*, 529 F.3d 25, 28 (1st Cir. 2008) (citing *Terry*, 392 U.S. at 21). Reasonable suspicion requires "more than a visceral hunch about the presence of illegal activity, [but] it requires less than probable cause." *United States v. Brown*, 500 F.3d 48, 54 (1st Cir. 2007) (citing *Chhien*, 266 F.3d at 6). To assess the reasonableness of the officer's suspicion, the court must ask whether, under the totality of the

circumstances, a reasonable officer would have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418 (1981).

It is well established that "whenever a police officer accosts an individual and restrains his freedom to walk away[,]" the officer seizes that person under the meaning of the Fourth Amendment. *Terry*, 392 U.S. at 16. This seizure need not amount to a formal arrest; "[s]uch a stop instead may occur merely upon law enforcement making what the Supreme Court has termed a 'show of authority.'" *United States v. Fields*, 823 F.3d 20, 25 (1st Cir. 2016) (quoting *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980)). A "show of authority" occurs only when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. Where police stop an individual unlawfully, without reasonable suspicion to do so, evidence seized as a result of the stop must be suppressed. *See, e.g.*, *Camacho*, 661 F.3d at 728.

The Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Place*, 462 U.S. 696, 706–07 (1983) (quoting *United States v. Chadwick*, 433 U.S. 1, 7 (1977)). The Fourth Amendment analysis for determining whether a privacy expectation is legitimate considers (1) whether the individual, by his conduct, has exhibited an actual expectation of privacy, and (2) whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable. *Bond v. United States*, 529 U.S. 334, 338 (2000). Warrantless searches of personal property are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347 (1967). The Fourth Amendment protects the owner of any container "that conceals its contents from plain view." *United States v.*

*Ross*, 456 U.S. 798, 822–23 (1982).

The Fourth Amendment does not protect against searches of intentionally abandoned property, as the former owner relinquishes his or her reasonable expectation of privacy. *See United States v. Lewis*, 40 F.3d 1325, 1334 (1st Cir. 1994); *United States v. Bey*, 52 F. Supp. 3d 299, 303 (D. Mass. 2014), *aff'd*, 825 F.3d 75 (1st Cir. 2016). However, an owner retains his or her privacy interest in property that is not voluntarily forfeited. *Bey*, 52 F. Supp. 3d at 303.

### III. Argument

#### A. The police had no reasonable suspicion that Mr. Leary was involved in criminal activity when they seized him in the truck bed.

The Supreme Court has held that the Constitution requires reasonable suspicion, constituting "more than a visceral hunch about the presence of illegal activity," to justify the stop of an individual. *Brown*, 500 F.3d at 54 (citing *Chhien*, 266 F.3d at 6). An officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–418 (1981).

In Mr. Leary's case, when the officers made the requisite show of authority, they lacked a lawful basis to seize him. At the time they approached Mr. Leary, he was merely leaning against the driver side window of a motor vehicle. Exhibit A at 4. This alone cannot incur "reasonable, articulable suspicion that criminal activity is afoot." *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004). Officers were relying upon information from the Gang Assessment Database and BRIC Officer Safety and Awareness Bulletin, as well as Mr. Leary's use of a fanny pack. These factors fall well below the threshold of reasonable suspicion. Mr. Leary's nervousness upon their approach and subsequent flight also fail to provide enough reasonable suspicion to justify his seizure. Under the totality of the circumstances, police lacked reasonable suspicion to stop Mr. Leary.

### 1. The Gang Assessment Database and BRIC Officer Safety and Awareness Bulletin are unreliable and do not indicate present criminal activity.

It was unreasonable for police to rely on the Gang Assessment Database and BRIC Officer Safety and Awareness Bulletin to stop Mr. Leary because those sources of information are largely unreliable and premised on uncorroborated reports.

As a general matter, an allegation of gang membership lacks the specificity required for a *Terry* stop; Mr. Leary's presence in the Gang Assessment Database is not the type of particularized information that the Fourth Amendment requires. *See United States v. Monteiro*, 447 F.3d 39, 47 (1st Cir.2006) (finding search unconstitutional where suspected gang involvement and prior arrests were not linked to *reliable* information about potential criminal activity); *United States v. Am*, 564 F.3d 25, 30 (1st Cir. 2009) (finding that an allegation of gang membership standing alone would likely be insufficient to warrant a *Terry* stop); *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir.1994) ("[K]nowledge of a person's prior criminal involvement…is alone insufficient to give rise to the requisite reasonable suspicion.").

A report provided by the Boston Police Department shows that nearly sixty-six percent of the nearly 5,000 people in the database are black, with more than half considered as "active" gang members. Philip Marcelo, *Gang database made up mostly of young black, Latino men*, Associated Press.[1] The Gang Assessment Database has not been reviewed by an independent third party to verify its reliability or effectiveness, but studies of similar databases have revealed significant problems with accuracy and racial profiling. *See, e.g.*, Elaine M. Howle, *The CalGang Criminal Intelligence System, California State Auditor Report 2015-130* (Aug. 11, 2016), available at https://www.auditor.ca.gov/pdfs/reports/2015-130.pdf. On June 11th, Boston

---

[1] Accessed on June 13, 2020, 3:29 PM, available at https://apnews.com/dd5643e358c3456dbe14c16ade03711d.

City Councilors withheld approval of an $850,000 state grant for the Boston Regional Intelligence Center amid concerns that a gang database racially profiles city immigrants and Black and brown youth. Dasia Moore & Milton J. Valencia, *Mayor Walsh declares racism a public health crisis in Boston, will seek to transfer 20% of police overtime budget to social services*, Boston Globe (June 12, 2020).[2]

Furthermore, the BRIC Officer Safety and Awareness Bulletin exists only for purposes of "officer safety and awareness purposes;" Mr. Leary was not wanted for arrest. Exhibit C. The information from this uncorroborated source was also, at the time of Mr. Leary's arrest, two weeks old. *Id*. Uncorroborated information, from a seemingly anonymous source, with no alleged imminent threat of danger, is insufficient to warrant a stop. *See Florida v. J.L.*, 529 U.S. 266, (2000) (holding that uncorroborated information from an anonymous tip was insufficient to warrant a *Terry* stop).

These considerations suggest that the information from the Gang Assessment Database and BRIC Officer Safety and Awareness Bulletin should not be considered reliable and cannot provide the basis for reasonable suspicion. *See Am*, 564 F.3d 25 at 30; *Monteiro*, 447 F.3d at 47.

During the detention hearing in this matter ATF Task Force Officer Keith Medeiros testified about the BRIC bulletin. He testified that the material in the BRIC Bulletin was "non-factual" and "un-corroborated." Detention Transcript, attached as Exhibit D.

```
Q. Okay. So what does it mean for a BRIC report like this to
say "Uncorroborated information"?
A. Nonfactual, uncorroborated, hasn't been confirmed.
Q. Okay. So maybe it hasn't been confirmed by an actual law
enforcement agency?
A. Could be.
Q. Okay. Maybe not confirmed by a witness who was willing to
identify themselves?
```

---

[2] Available at https://www.bostonglobe.com/2020/06/12/metro/mayor-walsh-declares-racism-be-public-health-crisis-bostonholding-press-confernece/.

```
A. Correct. Sources may have -- yeah, exactly.
Q. Okay. And it also indicates that either one of them could
be in possession of a firearm, right?
A. Correct.
Q. So not particularly Mr. Leary and not particularly
Mr. Silvello, one or the other?
A. That's accurate.
Q. Okay. And was it one particular firearm that the police
were concerned about in this July 31 report?
A. It's unknown, no.
Q. Okay. So it wasn't particularly the Glock that was later
found?
A. That's correct.
```

### 2. A fanny pack bag is not indicative of criminal activity.

Despite the alleged "trend" of storing firearms in fanny packs, "having a fanny pack does not alone constitute a basis for reasonable suspicion." *United States v. Cardona-Vicente*, 2014 WL 794591, at *2 n.2 (D.P.R. Feb. 26, 2014), *aff'd*, 817 F.3d 823 (1st Cir. 2016). In *Cardona-Vicente*, the court found the use of a fanny pack significant only when considered alongside the manner in which the defendant grabbed his fanny pack, as the officer found the defendant's grasp consistent with how one would hold a firearm. *Id*. at *2. In contrast, Mr. Leary was merely wearing a fanny pack, and not grabbing or protecting it in any way that would indicate that it contained contraband. *Id*. at *2 n.2.

The supplement to the Incident Report indicates that Boston Police are "familiar with a trend of concealing illegal firearms within fanny packs which gained popularity during the summer of 2019." Exhibit A. This also happens to be around the time when fanny packs became en vogue again. Andrea Zendejas, *The Chicest Way to Wear the Waist Bag Now*, Harper's Bazaar.[3] The chances of a young black man in Boston, wearing an in-fashion accessory, and finding himself reported in a police database that seemingly targets black youths, casts far too

---

[3] Accessed on June 13, 2020, 3:52 PM, available at https://www.harpersbazaar.com/fashion/trends/g14781922/cool-designer-fanny-packs/.

8

wide a net to constitute reasonable suspicion.

### 3. A nervous reaction to police presence does not establish reasonable suspicion.

Mr. Leary's nervousness did not indicate criminal activity. An officer noted that Mr. Leary appeared "wide eyed and…extremely concerned with the officer's actions." Exhibit A at 5.

The First Circuit has repeatedly recognized that "[n]ervousness is a common and entirely natural reaction to police presence." *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005). A nervous appearance does not provide a particularized objective basis for reasonable suspicion. *Id.* Indeed, officers do not suggest that Mr. Leary exhibited nervousness so extreme as to be distinguished from "the normal nervousness" that accompanies being approached by a police officer. *Cf. United States v. Belin*, 868 F.3d 43, 51 (1st Cir. 2017) (making a distinction between general nervousness as a reaction to police presence and the defendant's "strong reaction" that occurred only after an officer asked the defendant if he was armed).

The Court should also note that black people are more likely to be touched, handcuffed, pushed to the ground, or otherwise subjected to nonlethal force by a police officer. Quoctrung Bui and Amanda Cox, *Surprising New Evidence Shows Bias in Police Use of Force but Not in Shootings*, New York Times: The Upshot (June 13, 2020, 2:20 PM), https://nyti.ms/29J3K4O. In Mr. Leary's case, nervousness upon approach by multiple officers is a reasonable response; it did not indicate criminal activity.

### 4. Flight, like nervousness, cannot give rise to a reasonable suspicion of criminal activity.

The Supreme Court has held that "flight is not necessarily indicative of ongoing criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 120 (2000). Many courts have recognized this principle. *See Nebraska v. Hicks*, 488 N.W.2d. 359, 363 (Neb. 1992) ("[F]ear or dislike of

authority, distaste for police officers based upon past experience, exaggerated fears of police brutality or harassment and fear of unjust arrest are all legitimate motivations for avoiding the police."); *State v. Arrington*, 582 N.E.2d 649, 658 (Ohio Ct. App. 1990) ("[I]t is not unreasonable for a young, black male living in a neighborhood with drug sales and liable to be stopped to run when approached by a police car…"). Many citizens, particularly minorities, have good reason to avoid police interaction, as noted by Justice Stevens in his concurrence/dissent in *Wardlow*:

> "Among some citizens, particularly minorities and those residing in high crime areas, there is…the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence. …[T]he evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive."

*Wardlow*, 528 U.S. at 132–133 (Stevens, J., concurring in part and dissenting in part) (internal footnotes omitted).

Black men in Boston are disproportionately targeted for police encounters by the Boston Police Department, and this targeting suggests a reason for flight totally unrelated to consciousness of guilt. *See* Isaiah Thompson, *Black People Made Up 70 Percent of Boston Police Stops, Department Data Show*, WGBH.[4] The Massachusetts Supreme Judicial Court recognized this fact in *Com. v. Warren*, 58 N.E.3d 333, 342 (Mass. 2016). There, the court recognized that "the analysis of flight as a factor in the reasonable suspicion calculus cannot be divorced from the findings in a recent Boston Police Department[] report documenting a pattern of racial profiling of black males in the city of Boston," which demonstrated that black men are disproportionately and repeatedly targeted for field interrogation and observation encounters. *Id.*

---

[4] Accessed on June 13, 2020, 2:20 PM, available at https://www.wgbh.org/news/local-news/2020/06/12/black-people-made-up-70-percent-of-boston-police-stops-department-data-show.

10

at 342. These findings suggest that a black man, "when approached by the police, might just as easily be motivated by the desire to avoid the recurring indignity of being racially profiled as by the desire to hide criminal activity." *Id.* Indeed, "a page of history" about encounters between young black men and the police in Boston "is worth a volume of logic." *Com. v. Warren*, 31 N.E.3d 1171, 1185 (Mass. Ct. App. 2015), *vacated*, 58 N.E.3d 333 (Mass. 2016) (Agnes, J., dissenting) (quoting New York Trust Co. v. Eisner, 256 U.S. 345, 349 (1921) (Holmes, J.)). Black suspects are more than twice as likely to be killed by police than are persons of another race. Jeffrey A. Fagan & Alexis D. Campbell, *Race and Reasonableness in Police Killings*, 100 BOS. UNIV. L. REV. 951, 951 (2020). For black men in Boston, an encounter with police may cost them their lives. Dozens March Through Boston in Protest of Police Brutality, *WCVB 5*.[5]

Given this reality for black males in the city of Boston, the Court should not find the fact that Mr. Leary ran from the police a reasonable factor in seizing him.

### B.  **Mr. Leary maintained a reasonable expectation of privacy in his fanny pack.**

Mr. Leary did not relinquish his constitutional protection from unreasonable search and seizure of his property when his fanny pack was lost as he ran.[6]  There was no reasonable basis for officers to believe that Mr. Leary intentionally abandoned the fanny pack and thus renounced such right. When a defendant *intentionally* abandons property before seizure occurs, the Fourth Amendment is not implicated. *See Lewis*, 40 F.3d at 1334. Abandonment must be a voluntary act. *Bey*, 52 F. Supp. 3d 299 at 303. Thus, "[l]oss is not the same thing as abandonment. And loss alone cannot support a finding of abandonment." *United States v. Sparks*, 806 F.3d 1323, 1344

---

[5] Accessed on June 16, 2020, 7:26 PM, available at https://www.wcvb.com/article/rally-outside-suffolk-district-attorneys-office-to-protest-police-brutality-in-boston-massachusetts/32884228.
[6] A fanny pack is a "common repository for one's personal effects," and therefore is imbued with the expectation of privacy. *Arkansas v. Sanders*, 442 U.S. 753, 753 (1979), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991).

(11th Cir. 2015). Because his belongings were not abandoned voluntarily, Mr. Leary maintained a reasonable expectation of privacy and thus retained his Fourth Amendment protections. *Bey*, 52 F.3d at 304.

When officers were searching for evidence, they first found Mr. Leary's shoe, stuck on a fence. Exhibit A at 5. The reasonable conclusion would have been that Mr. Leary did not, while running from the police, intentionally relinquish his shoes, just as he did not intentionally abandon his bag. Having just seen him with his effects moments ago, there was no reason to doubt Mr. Leary's continued ownership. *Cf. Smith v. Ohio*, 494 U.S. 541 (1990) (holding that a person who attempts to protect his private property from inspection, after throwing it on a car to respond to a police officer's inquiry, has not abandoned that property). Under the circumstances of this case, no reasonable officer could conclude that Mr. Leary intended to forever abandon his property; searching his fanny pack therefore constituted a violation of Mr. Leary's privacy rights under the Fourth Amendment. *Cf. Rios v. United States*, 364 U.S. 253, 262, n. 6, 80 S.Ct. 1431, 1437, 4 L.Ed.2d 1688 (1960) (finding that it would be unreasonable to assume a passenger who dropped a package to the floor of the taxicab in which he is riding "abandoned" it).

### C. The search of Mr. Leary's fanny pack was unlawful.

When police search for evidence of a crime, without a warrant, for the purpose of turning up proof to convict, Fourth Amendment protections are at their strongest. *Abel v. United States*, 362 U.S. 217, 237 (1960) ("Searches for evidence of crime present situations demanding the greatest, not the least, restraint upon the Government's intrusion into privacy..."). The discovery of the fanny pack flowed directly from Mr. Leary's seizure. When the police arrested Mr. Leary subsequent to surrounding him in the truck, they had no evidence of any wrongdoing. Exhibit A at 5. Having no reason to connect to Mr. Leary to any crime, they set out in the hope that evidence would develop. In the words of the First Circuit, "it is precisely such tactics that the

12

Fourth Amendment makes unlawful." *Cf. Com. of Mass. v. Painten*, 368 F.2d 142, 144 (1st Cir. 1966), *aff'd*, 389 U.S. 560 (1968) (holding that officers, who, without evidence to connect the defendant to a crime, set out to arrest and search the defendant in the hope that evidence would develop, violated the Fourth Amendment). Even if officers held independent suspicion over the bag, "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ... reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*, 573 U.S. 373, 382 (2014) (quoting *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 653 (1995)).

The warrantless search of Mr. Leary's fanny pack cannot be salvaged through any legal principles. In *Katz v. United States*, the Supreme Court held that "[s]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." 389 U.S. at 347. Mr. Leary's case fits none of those circumstances, *i.e.*, there was no exigency, and this was not a search incident to arrest.

Given the lack of legal exception, a search warrant was required to search Mr. Leary's fanny pack. *Katz*, 389 U.S. at 347. The warrantless search violated the Fourth Amendment.

**IV.   Conclusion**

For the reasons stated in this memorandum, Mr. Leary respectfully asks this Court to suppress the evidence at issue.

        Respectfully Submitted
        SEMAJ LEARY
        By His attorney,

        */s/Jessica P. Thrall*
        Jessica P. Thrall,
        BBO #670412
        Federal Public Defender Office
        51 Sleeper Street, 5th Floor
        Boston, MA  02210
        (617) 223-8061

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 4, 2020.

        */s/Jessica P. Thrall*
        Jessica P. Thrall