**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) ) ) ) ) ) | |
| v. | ) ) | Criminal No. 19-cr-10474-DJC-1 |
| **SEMAJ LEARY,** | ) ) ) | |
| **Defendant.** | ) ) ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                         **October 30, 2020**

## I.   Introduction

Defendant Semaj Leary ("Leary") has moved to suppress the firearm and magazine from his fanny pack seized by Boston Police Department ("BPD") officers on August 15, 2019.  D. 43. Having considered the motion, D. 43, the government's opposition, D. 55, and the evidence presented by both parties at the evidentiary hearing on October 8, 2020, D. 60, the Court DENIES the motion.  In support of this ruling, the Court makes its findings of fact and legal analysis below.

## II.   Findings of Fact

These findings are based upon the evidence presented at the October 8th hearing including the testimony of BPD Officers Matthew Conley and Thomas Noto and Leary and exhibits.

### A.   BPD Officers Encounter Leary While on Patrol

On the night of August 14, 2019, Officers Conley and Noto, Sergeant Byrne and one other officer of the Youth Violence Strike Force (commonly referred to as the gang unit) were on patrol. The four were traveling in an unmarked police car and Conley was driving.  During their patrol,

1

Conley pulled into the parking lot behind the apartment building located at 20-30 Columbus Avenue. They often patrol this area because it is where members of the H-Block gang are known to gather. When the officers pulled into the lot, Conley immediately saw Leary, whom both Conley and Noto recognized, and Conley knew from prior encounters. They observed Leary leaning into the driver's side of a SUV parked in the lot. Conley was aware that Leary had been arrested before for illegal possession of a firearm. At the time that they spotted Leary, Conley and Noto were aware of Boston Regional Intelligence Center ("BRIC") report circulated to BPD officers. Exh. 9 (BRIC report). This BRIC report, disseminated on July 31, 2019, two weeks before this incident, reported that there "uncorroborated information, based on an ongoing investigation into a ShotSpotter[1] activation" that Leary, identified as a "H Block associate," and another individual may be in possession of a firearm and operating a black 2008 Ford Taurus. Id. The report also noted Leary's "past firearm activity" and advised that "[i]f located, officers should approach with caution." Id.

When Conley first observed Leary, it appeared that he was speaking to the driver of the SUV (not the Ford Taurus described in the BRIC report). The officer further observed that when Leary spotted the officers, he looked nervous and began to walk away from the vehicle. Leary testified that he was in the vicinity for a cookout that had occurred earlier in the evening. Leary further testified that he feels unsafe when he sees the police because of a 2012 incident in which he was assaulted by police and that he was regularly stopped by the police for questioning (i.e., "FIOs") in the 2018-19 timeframe. When he saw the unmarked vehicle and the four officers that night, Leary got nervous. Conley further observed that Leary appeared nervous and was wearing

---

[1] ShotSpotter is a system that alerts the BPD to firearm shots fired in the city.

a fanny pack across his chest. That summer, the summer of 2019, the BPD had made four arrests involving firearms concealed in fanny packs.

### B.     Leary Runs and the BPD Officers Pursue Him

As Leary began to walk away, Conley parked the police vehicle and got out and addressed Leary. Leary had taken a few steps, but then broke into a full sprint. Conley gave chase as did Noto and Sergeant Byrne. Conley was the closest behind, but as the chase continued, the distance between him and Leary grew. Exh. 1 (Conley's bodycam video of pursuit). Noto was further behind Conley in the pursuit. Leary jumped a fence and ran across Columbus Avenue. Leary then ran into an alleyway. Initially, Conley saw that Leary was pumping his arms as he ran, but then, while in the alleyway, Conley could not see Leary's hands. While chasing Leary, Conley yelled "hands up or you're going to get shot" multiple times. During the pursuit, Conley lost sight of Leary at some point. At some point in running and jumping over four to five fences, Leary lost his sneakers, including one that got caught in a fence. Exhs. 2, 11. An individual in the vicinity told Noto that someone had jumped into a truck in the back of 16 Chilcott Place. Accordingly, the BPD set up a perimeter around the residence there. Exh. 5. Other officers who had been called to the scene there drew Conley's attention to a pickup truck where they thought Leary might be hiding. Exhs. 6, 7. Other officers approached the truck first and found Leary there where he was placed under arrest. Conley and Noto were there as he was being arrested and both testified that Leary initially resisted arrest, which Leary disputes.

### C.     Discovery of Leary's Fanny Pack

As he was being arrested, Conley and Noto observed that he was no longer wearing the fanny pack and he was now shoeless. Retracing Leary's path, the officers found one of his (red) sneakers caught in a fence. Exh. 11. Noto discovered the fanny pack, containing a firearm and

extra magazine, in the yard in front of the fence where the sneaker was located. Exhs. 3, 11. When Noto found it, the fanny pack was under a door, which was leaning against the garage, but he moved the door so it was then leaning against the tree. When Noto found the fanny pack, it was open. Exh. 4. The officer found the fanny pack approximately ten minutes after Leary's arrest.

### III. Discussion

#### A. Leary Forfeited His Expectation of Privacy in the Fanny Pack

To challenge a search or seizure, "a defendant must have a reasonable expectation of privacy in the area searched or the item seized." United States v. Bailey, No. 08-10031-PBS, 2009 WL 524730, at *2 (D. Mass. Feb. 26, 2009). Here, where Leary admitted his ownership of the fanny pack, he initially had a reasonable expectation of privacy in it and its contents. Such expectation, however, "may be forfeited by voluntary acts of abandonment." United States v. Wilkins, 451 F. Supp. 3d 222, 227 (D. Mass. 2020); see Bailey, 2009 WL 524730, at *2 (noting that "[i]t is well settled that if a defendant abandons property while he is being pursued by police officers, he forfeits any reasonable expectation of privacy he may have had in that property").

To demonstrate abandonment, the government must "establish by a preponderance of the evidence that the defendant's voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item searched or seized." Bailey, 2009 WL 524730, at *2 (internal quotations omitted). Courts "look at the totality of the circumstances" when conducting this assessment, "but pay particular attention to explicit denials of ownership and to any physical relinquishment of property." Id. (internal quotation omitted); see California v. Hodari D., 499 U.S. 621, 629 (1991) (holding cocaine suspect tossed while running from officers, prior to suspect's seizure, was abandoned and

thereby not the fruit of a seizure); United States v. Sealey, 30 F.3d 7, 10 (1st Cir. 1994) (holding suspect who discarded his firearm and ammunition while being chased by police abandoned same and thereby extinguished his Fourth Amendment claim); Wilkins, 451 F. Supp. 3d at 230 (holding defendant forfeited any reasonable expectation of privacy in the contraband when he tossed the bag of drugs under an anonymous parked car as he ran from troopers).  A defendant who is trying to show that he did not in fact abandon the property must demonstrate that he had an expectation the item would remain private.  Bailey, 2009 WL 524730, at *2.  "While the issue of a defendant's subjective intent to abandon property is primarily a question of fact, whether his expectation of privacy in the allegedly abandoned property was reasonable is a matter of law for the court."  Wilkins, 451 F. Supp. 3d at 227.

Considering the totality of circumstances here, the Court concludes that Leary abandoned the fanny pack during his flight from the police.  Leary testified that he did not remember losing the fanny pack, strapped across his chest, while he was running and climbing over fences, but that it must have slipped off.  The fanny pack, however, would have been weighty with both a firearm and a spare magazine in it and it is hard to envision how it might have slipped or fallen off when the continuous loop of the pack was strapped across Leary's chest.  The defense questioned whether the fanny pack had been discovered under the door leaning toward the garage in the yard, as Noto testified, or next to the door leaning against the tree as depicted in the photos. Either way, neither location, some distance away from the fence where Leary's sneaker was caught, suggests how the fanny pack strapped across Leary's chest "slipped off" and landed there.  Unlike in United States v. Bey, 52 F. Supp. 3d 299, 303 (D. Mass. 2014), Leary's abandonment did not come as a disavowal of ownership in non-voluntary statement that came in response to police inquiry after arrest and before Miranda warnings, id., but during a moment when he was out of the sight of

police in his flight from them, similar to Sealey, 30 F.3d at 10; Wilkins, 451 F. Supp. 3d at 227. Having reached this conclusion, the Court concludes that Leary abandoned the fanny pack and firearm and magazine inside.

### B. The BPD Officers' Encounter with Leary in the Parking Lot was not a Seizure

To the extent that Leary argues that the officers' initial encounter with him constituted a seizure, the Court does not agree. Not every encounter with the police rises to the level of a stop and seizure. See, e.g., United States v. Cardoza, 129 F.3d 6, 15 (1st Cir. 1997) (holding officer who called through open car window, "what are you doing out at this time of night?" did not objectively communicate an attempt to restrain defendant's liberty); Sealey, 30 F.3d at 8-10 (holding officer who shouted from police vehicle, "Hey Steven, what's up?" did not seize defendant for Fourth Amendment purposes). Such seizure occurs when the police use physical force against a person or the person submits to a show of authority sufficient to cause a reasonable person to believe that he was not free to leave the police encounter or refuse to cooperate. Hodari D., 499 U.S. at 625-26. By all accounts, at the time Leary fled, the police had pulled into the parking lot, had started to get out of the vehicle and Conley had called to Leary. Leary, who reported having been stopped previously by officers on forty to fifty occasions, was not submitting to force or any show of authority at this point.   See Florida v. Royer, 460 U.S. 491, 497 (1983) (noting law enforcement officers do not violate the Fourth Amendment "by merely approaching an individual on the street or in another public place, by asking [the individual] if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions"); United States v. Drayton, 536 U.S. 194, 200-01 (2002) (same). Accordingly,

since there was no stop and seizure before Leary's flight and subsequent abandonment of the fanny bag, any "fruit of the poisonous tree" analysis is inapplicable here.

### C. When the Officers Arrested Leary, They Had At Least Reasonable Suspicion that He was Armed and Dangerous and Probable Cause to Arrest Him on Other Charges

By the time the officers discovered Leary hiding in the pickup truck behind a private residence (not his own), the officers knew and had observed the following: the BRIC report of just two weeks prior that Leary may be carrying a firearm and had a history of firearm activity; that he was believed to be a member of H Block gang and the vicinity of 20-30 Columbus Avenue was frequented by this gang; that four arrests had been made that summer in which firearms were concealed in fanny packs; that Leary was wearing a fanny pack strapped across his chest and that upon sighting of the officers at 20-30 Columbus Avenue, a nervous-looking Leary took a few steps and then sprinted away, across a busy thoroughfare, down an alleyway, over multiple fences, through the yards of multiple residences before hiding himself in a truck where he was found without the fanny pack. Given the totality of these circumstances, see United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004), and the progression of the events as they unfolded, United States v. Wright, 582 F.3d 199, 213 (1st Cir. 2009), the police had at least reasonable suspicion to believe that he was armed and dangerous at the time that they found him in the pickup truck. Terry v. Ohio, 392 U.S. 1, 30-31 (1968); United States v. Rasberry, 882 F.3d 241, 249 (1st Cir. 2018).

Moreover, at this point, the officers, even before discovery of the abandoned fanny pack containing the firearm and extra magazine, had probable cause to arrest him on other charges, including trespass and resisting arrest. Although the Court is aware that the officers did not charge Leary with same, instead charging him with firearm offenses, and Leary disputes the factual basis for these two charges, particularly the latter (i.e., Leary testifying that it was the officers who

stomped and kicked him while arresting him), the relevant inquiry is whether "at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." United States v. Martinez-Molina, 64 F.3d 719, 726 (1st Cir. 1995).  Based upon Leary's flight through several yards and eventual hiding in a truck behind another residence, the officers had probable cause as to the trespass charge and given Conley and Noto's accounts regarding the moments of his arrest, they also had probable cause as to the resisting arrest charge.  See D. 55 at 7 & n.7, 8 (discussing elements of same).

### IV.     Conclusion

For the aforementioned reasons, Leary's motion to suppress, D. 43, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge